## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

CHARLES CLOUD,

     Plaintiff,

v.                               CASE NO.: 4:19-cv-161

THE FLORIDA DEPARTMENT OF
CORRECTIONS, an agency of the
State of Florida, THE GEO GROUP,
INC., a Florida Corporation,
WELLPATH LLC, a Delaware
Corporation, CORIZON, LLC, a
Missouri Limited Liability Company,
CENTURION OF FLORIDA, LLC, a
Florida Limited Liability Company,
DANIEL CHERRY, an individual,
and CHARLES GREGORY
LINDSEY, an individual,

     Defendants.
_____/

## **COMPLAINT**

    The Plaintiff, Charles Cloud ("Cloud"), by and through the undersigned

counsel, hereby sues the Florida Department of Corrections ("FDC"), The GEO

Group, Inc. ("GEO"), Wellpath LLC[1] ("Wellpath"), Corizon, LLC ("Corizon"),

---

[1] Wellpath was formerly known as Correct Care Solutions, LLC. The name changed occurred after CCS merged with another healthcare company in 2019.

Centurion of Florida, LLC ("Centurion"), Daniel Cherry ("Cherry"), and Charles Gregory Lindsey ("Lindsey"), and alleges as follows:

## INTRODUCTION

1.    This is a civil rights action brought by Plaintiff Cloud seeking monetary damages for the Defendants' violations of Plaintiff's rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* The Defendants violated Plaintiff's rights by denying him the treatment that was required and necessary to cure Plaintiff infection with Hepatitis C Virus (HCV), which constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment and discrimination on the basis of disability in violation of the Americans with Disabilities Act and the Rehabilitation Act.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States.

3.    Jurisdiction and venue are proper in the Northern District of Florida (Tallahassee Division) in that the FDC is headquartered with its principle place of

business in Leon County, Florida, and the alleged acts of misconduct giving rise to this cause of action occurred within the Northern District of Florida.

4.    The claims alleged herein are brought within the applicable statute of limitations.

5.    The Plaintiff has complied with all conditions precedent and, if applicable, has properly exhausted all administrative remedies prior to filing this action. On multiple occasions, Plaintiff filed grievances at the facilities he was detained. In particular, Plaintiff filed an informal grievance with medical in July 2018 requesting treatment for HCV. In response to his grievance, Plaintiff was "approved" for treatment, thereby satisfying the exhaustion requirement. Alternatively, this action was filed after Plaintiff's release from confinement and, therefore, the exhaustion requirement does not apply to Plaintiff. In other words, Plaintiff, a former prisoner, is not required to comply with the exhaustion requirement of the Prison Litigation Reform Act ("PLRA").

## THE PARTIES

### Charles Cloud

6.    Plaintiff Cloud brings this action for violation of the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. Plaintiff Cloud is a former inmate who was incarcerated in the State of Florida.

During his incarceration from May 2003 to January 2019, Plaintiff was housed at both state and private prison facilities throughout Florida.

7.     Plaintiff tested positive for HCV in 2003 while incarcerated at Bay Correctional Facility ("Bay CF"). Defendants GEO, Wellpath, Corizon, Centurion, and FDC have ordered, required, and/or conducted some testing of Plaintiff to monitor his HCV while incarcerated, but denied him treatment for several years even though he was deemed eligible and qualified for treatment. For years Plaintiff requested HCV treatment and for years he was denied such treatment. As a result of Defendants' failure to treat his chronic HCV, Plaintiff developed cirrhosis of the liver, the most advanced stage of liver scarring. *See infra.* In July of 2018, after spending years trying to obtain the treatment he was constitutionally entitled to receive, Plaintiff was finally "approved" for HCV treatment. However, despite this approval, Plaintiff was informed that he was not eligible for treatment because of his release date from prison. Ultimately, Plaintiff never received treatment prior to his release from prison in January 2019. Instead, after spending more than fifteen years in prison, Plaintiff entered the general population as an HCV-infected person with stage F4 cirrhosis of the liver. *See infra.*

**The GEO Group, Inc.**

8.    Defendant GEO is a Florida-based company and private prison owner and operator. Defendant GEO operates private correctional facilities in Florida pursuant to contracts entered into with the State of Florida and Defendant FDC.

9.    Bay CF is a private correctional facility in Florida operated by Defendant GEO under contract with the State of Florida and Defendant FDC. Defendant GEO operated Bay CF at all times relevant to this Complaint.

**Wellpath LLC**

10.    Defendant Wellpath, formerly known as Correct Care Solutions, LLC,[2] is a healthcare company contracted with Defendant GEO to provide healthcare services to inmates detained at private correctional facilities in Florida. At all times relevant hereto, Defendant Wellpath provided healthcare services at Bay CF, one of the facilities where Plaintiff was housed and denied treatment for his HCV.

**Corizon, LLC**

11.    Defendant Corizon is a Missouri-based company and provider of correctional healthcare. Pursuant to a contract with FDC, Defendant Corizon provided healthcare services to inmates detained at state and private correctional facilities in Florida until approximately May 2016. At all relevant times prior to May

---

[2] In January 2019, Correct Care Solutions, LLC changed its name to Wellpath LLC as the result of a merger with Correctional Medical Group Companies, Inc.

2016, Defendant Corizon provided healthcare services at Bay CF, one of the facilities where Plaintiff was housed and denied treatment for his HCV.

## Centurion of Florida, LLC

12.    Defendant Centurion is a Florida-based company and provider of correctional healthcare. In approximately February 2016, Defendant Centurion contracted with Defendant FDC to provide healthcare services to inmates detained at state and private correctional facilities in Florida. Centurion replaced Corizon as FDC's healthcare services provider. At all relevant times hereto, Defendant Centurion provided healthcare services at Bay CF and Suwannee Correction Institution ("Suwannee CI"), two of the facilities where Plaintiff was housed and denied treatment for his HCV.

13.    Defendants GEO, Wellpath, Corizon, and Centurion are hereinafter referred to collectively as the "Private Entity Defendants."

## The Florida Department of Corrections

14.    Defendant FDC is an agency of the State of Florida that owns and operates correctional facilities in the state, and which receives federal funds to operate its agency. Defendant FDC is headquartered in Leon County, Florida and therefore venue is proper in Tallahassee, Florida. Defendant FDC is responsible for overseeing the operations of its contractors, including the Private Entity Defendants.

At all times relevant hereto, Defendant FDC owned and operated Suwannee CI, one of the facilities where Plaintiff was housed and denied treatment for his HCV.

### Daniel Cherry

15.    Defendant Cherry is a licensed osteopathic physician who worked at Bay CF all times relevant hereto. Upon information and belief, Defendant Cherry was the Regional Medical Director for Defendant Corizon and, in approximately 2016 when Centurion replaced Corizon as FDC's healthcare provider, became the Statewide Medical Director for Defendant Centurion. Defendant Cherry refused to treat Plaintiff's HCV despite being aware of Plaintiff's serious medical condition and disability.

16.    At all times relevant hereto, Defendant Cherry acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendant Cherry is sued in his individual capacity.

### Charles Gregory Lindsey

17.    Defendant Lindsey is a licensed, registered nurse who worked at Bay CF at all times relevant hereto. Defendant Lindsay was employed by Defendant Wellpath (formerly CCS) as the Health Services Administrator ("HSA") and worked at Bay CF at all times relevant hereto. Defendant Lindsey has been a licensed, registered nurse for more than twenty years.  Defendant Lindsey refused to treat

Plaintiff's HCV despite being aware of Plaintiff's serious medical condition and disability.

18.    At all times relevant hereto, Defendant Lindsey acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendant Lindsey is sued in his individual capacity.

## FACTS

### Background Information on Hepatitis C

19.    Hepatitis C is a blood borne disease caused by the Hepatitis C Virus (HCV). The virus causes inflammation that damages liver cells, and is a leading cause of liver disease and liver transplants.

20.    HCV is transmitted by infected blood via several methods, including intravenous drug use and tattooing using shared equipment, blood transfusions with infected blood (typically before regular screening of donated blood began), and sexual activity. Intravenous drug use is the most common means of HCV transmission in the United States.

21.    HCV can be either acute or chronic. In people with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. Chronic HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure. Fifty-five (55) to eighty-five (85) percent of infected people will develop chronic HCV.

22.    Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body. Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

23.    People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring. Scar tissue cannot perform the job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity. Fibrosis can also lead to hepatocellular carcinoma (liver cancer).

24.    When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. Of those with chronic HCV, the majority will develop chronic liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe.

25.    Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue. Most of these complications can

occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

26.     Abdominal ascites can require paracentesis, a procedure wherein a needle is inserted into the abdomen to drain the fluid. Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

27.     Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible. Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

28.     Cirrhosis that is accompanied by serious complications is known as decompensated cirrhosis. Cirrhosis without serious complications is called compensated cirrhosis.

29.     Thus, HCV is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. This physical impairment substantially limits one or more major life activity, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as

digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver.

30.    For all FDC inmates who have been diagnosed with HCV, there is a record of their impairment.

31.    Defendant FDC regards all inmates with HCV as having a physical impairment that substantially limits one or more major life activity.

32.    Chronic HCV is, as a matter of law, a serious medical need.

### General Prevalence of HCV

33.    Approximately 2.7 to 3.9 million Americans have chronic HCV.

34.    In 2000, the United States Surgeon General called HCV a "silent epidemic," and estimated that as much as two percent of the adult U.S. population had HCV.

35.    In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

36.    Approximately 19,000 people die of HCV-caused liver disease every year in the United States.

37.    HCV is the leading indication for liver transplants in the United States.

## HCV in Prison

38.     The prevalence of HCV in prison is much higher than in the general population. It is estimated that between 16% and 41% of the United States' jail and prison population has HCV. Thus, incarceration is a risk factor for HCV.

39.     Defendant FDC has reported to the media and researchers that 5,000 to 5,272 of its approximately 98,000 inmates have HCV. As of August 8, 2016, Defendant FDC listed 4,797 inmates as having HCV in its internal records. As of late-2017, it was estimated that at least 7,000 inmates are infected with HCV.

40.     Because FDC does not conduct routine opt-out testing for HCV, upon information and belief, FDC is undercounting the number of inmates with HCV.

41.     In fact, because it is estimated that between 16% and 41% of incarcerated people have HCV, it is likely that between 14,700 and 40,184 FDC inmates have HCV. The true number is likely at the higher end of that spectrum because of the high prevalence of HCV in Florida: Between 2009 and 2013, rates of acute HCV in Florida increased by 133%.

## Standard of Care for HCV

42.     For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications and sometimes required injections, had a long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with

numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other comorbid diseases.

43.    In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications, called direct-acting antiviral ("DAA") drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

44.    These DAA drugs—currently Sovaldi (sofosbuvir), Olysio (simeprevir), Harvoni (sofosbuvir/ledipasvir), Viekira Pak (ombitasvir/paritaprevir/ritonavir/dasabuvir), Daklinza (daclatasvir), Technivie (ombitasvir/paritaprevir/ritonavir), Zepatier (elbasvir/grazprevir), and Epclusa (sofosbuvir/velpatasvir)—have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally (commonly a once-daily pill) rather than by injections. They have truly revolutionized the way HCV is treated.

45. Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one third of patients.

46. For HCV, a "cure" is defined as a sustained virologic response ("SVR")—i.e., no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

47. In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org. The Centers for Disease Control and Prevention ("CDC") encourages health care professionals to follow the evidence-based standard of care developed by the IDSA/AASLD.

48. The IDSA/AASLD guidelines set forth the medical standard of care for the treatment of HCV, which is now well-established in the medical community.

49. The IDSA/AALSD panel, through the HCV Guidance, recommends immediate treatment with DAA drugs for all persons with chronic HCV. This is the standard of care for the treatment of HCV, and it reflects the continuing medical

research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

50.     The Florida Department of Children and Families ("DCF"), the agency responsible for administering the Medicaid program in Florida, recently confirmed that, in determining what is medically necessary and therefore covered by the Medicaid program, DAA medications for HCV should be approved for all adult patients with an HCV diagnosis. DCF also specifically eliminated any requirement that there be any evidence of hepatic fibrosis before covering treatment. Thus, DCF has recognized that the standard of care for HCV is to provide immediate treatment with DAA drugs to all patients with HCV, regardless of the stage of the disease.

51.     Under this standard of care, treatment with DAA drugs is expected to cure nearly all infected persons.

52.     The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

53.     Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

## Screening, Diagnosis, and Monitoring of HCV

54.    Under the IDSA/AASLD guidelines, all persons with risk factors for HCV infection should be offered testing for HCV. This includes all persons born between 1945 and 1965 and all persons who were ever incarcerated.

55.    A person is generally diagnosed with HCV through a rapid blood test in which the blood is examined for HCV antibodies. A follow-up blood test determines whether the genetic material of HCV remains in the blood. A third blood test can determine which variation, or genotype, of HCV a person has.

56.    Although the standard of care is to treat all persons with chronic HCV with DAA drugs, it is still useful to determine the progression of fibrosis and/or cirrhosis in the liver to choose the appropriate DAA drug, to treat other conditions or complications a person may be experiencing, to screen for liver cancer, to advise patients about contraindications and drugs to avoid, and to determine whether liver transplantation is necessary.

57.    There are several methods used to determine the level of cirrhosis or fibrosis, along with an evaluation of the patient's symptoms. One such method is a liver biopsy, which is a surgery wherein a small sample of liver tissue is removed and histologically assessed. A typical biopsy evaluation method is a scoring system called METAVIR, which provides two separate assessments: (i) an activity grade (A0–A3), which indicates the degree of inflammation in the liver and (ii) a fibrosis

stage (F0–F4), which represents the amount of fibrosis or scar tissue on the liver. Fibrosis stage F0 represents no fibrosis whereas fibrosis stage F4 represents cirrhosis. A fibrosis stage of F2 or greater is considered significant fibrosis. Liver biopsies are generally regarded as the most accurate measure of fibrosis and cirrhosis, but they are not routinely recommended because they are invasive and potentially dangerous, and also because they are generally unnecessary, as the standard of care is to treat all HCV patients, regardless of disease progression.

58.    Noninvasive methods of assessing fibrosis and cirrhosis include blood tests, such as the APRI (AST to Platelet Ratio Index) score. This score is a ratio derived by comparing the level of an enzyme in the blood called aspartate aminotransferase (AST) with the usual amount of AST in the blood of a healthy person and the number of platelets in the affected person's blood. Generally, an APRI score greater than 0.7 indicates significant fibrosis, and a score of 1.0 or greater indicates cirrhosis. But as explained below, a low APRI score does not necessarily indicate the absence of fibrosis.

59.    Another blood test is called the FIB-4, which is a ratio derived using the level of two enzymes in the blood, AST and alanine aminotransferase (ALT), as well as platelet count and the person's age.

60.    Another noninvasive method for evaluating the degree and severity of liver disease includes serum fibrosis marker panels, such as the HCV FibroSure test.

Using six biochemical markers, the HCV FibroSure test provides a measure of liver fibrosis, which corresponds to the METAVIR fibrosis stages (F0–F4), as well as of necroinfammatory activity, which corresponds to the METAVIR activity grades (A0–A3).

61.    Standard ultrasounds or sonograms of the liver are unreliable indicators of the level of fibrosis, as advanced fibrosis may not be detected by these scans. But there is a more accurate version called FibroScan, which is a type of ultrasound known as transient elastography that uses sound waves to determine the amount of fibrosis present in the liver.

62.    In assessing the level of fibrosis or cirrhosis, the entire clinical picture must be taken into account. There is no one blood test, scan, or symptom that will accurately determine the extent of liver damage, and therefore relying solely on strict numerical cutoffs of any test result is inappropriate. Any abnormal test result or symptom should be taken as a sign of fibrosis or cirrhosis, but normal results in isolation cannot rule out fibrosis or cirrhosis.

63.    Relying solely on the APRI score to make treatment decisions is not adequate or appropriate because APRI has significant limitations. First, when an APRI score is extremely high, it has good diagnostic utility in predicting severe fibrosis or cirrhosis, but low and mid-range scores may miss many people who have significant fibrosis or cirrhosis. In fact, in more than 90% of HCV cases, an APRI

score of at least 2.0 indicates that a person has cirrhosis, but more than half of people with cirrhosis will not have an APRI score of at least 2.0. Second, where a person has been diagnosed with cirrhosis or advanced fibrosis through some other means, a low APRI score does not negate the diagnosis—it should be presumed the patient has cirrhosis. Third, because AST levels fluctuate from day to day, a decreased or normalized level does not mean the condition has improved, and even a series of normal readings over time may fail to accurately show the level of fibrosis or cirrhosis.

64.    A health care provider must also evaluate a patient's symptoms and determine whether the liver disease is compensated or decompensated. Once liver disease has advanced, scoring of the clinical degree of liver dysfunction is done using the Childs-Pugh (C-P) score, also termed the Child-Turcotte-Pugh score (CTP). Variables include the serum albumin and bilirubin, ascites, encephalopathy, and prothrombin time (a measure of how well the blood clots). The score ranges from 5 to 15. Patients with a score of 5 or 6 have CTP class A cirrhosis (well-compensated cirrhosis), those with a score of 7 to 9 have CTP class B cirrhosis (significant functional compromise), and those with a score of 10 to 15 have CTP class C cirrhosis (decompensated cirrhosis).

65.    Once cirrhosis has developed, patients should also be followed with twice yearly alfa fetoprotein (AFP) screens, which is a serum marker for the

development of liver cancer. Increases in AFP indicate the possible presence of liver cancer.

66.    Individuals with comorbid HIV (or other immune disorders) and HCV are at a much greater risk for more rapidly progressive liver disease, and should be treated and closely followed.

**FDC's Unlawful Policy and Practice of Denying Treatment for HCV**

67.    Despite the clear agreement in the medical community that all persons with chronic HCV should be treated with DAA drugs, FDC does not provide these lifesaving medications to FDC inmates with HCV. Instead, FDC has a policy, custom, and practice of not providing DAA medications to inmates with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of inmates with HCV.

68.    This policy, practice, and custom has caused, and continues to cause, the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC inmates with HCV.

69.    Although FDC has a policy governing the treatment of inmates with HCV, which is outlined in Supplement #3 to Health Service Bulletin (HSB) 15.03.09 and was promulgated on June 27, 2016, in practice almost no inmates receive DAA medications. Instead, FDC simply enters the names of inmates with known HCV

infection into a database and enrolls them in a gastrointestinal clinic—which means blood draws are taken every six to twelve months—but does not actually treat them.

70.    Although the HSB states that "all patients with chronic HCV infection may benefit from treatment," it does not require treatment for anyone. Rather, the HSB recommends treatment based on priority levels.

71.    In Priority Level 1 ("highest priority") are patients with decompensated cirrhosis measured as a 7-9 on the CTP scale, liver transplant candidates or recipients, patients with hepatocellular carcinoma and other serious comorbid medical conditions, and patients on immunosuppressant medication. In Priority Level 2 ("high priority") are patients with an APRI score greater than 2, advanced fibrosis shown on a liver biopsy, or other comorbid diseases and infections. In Priority Level 3 ("intermediate priority") are patients with Stage 2 fibrosis shown on a liver biopsy, an APRI score greater than 1.5, and patients with porphyria or diabetes. In Priority Level 4 ("routine") are patients with stage 1 fibrosis shown from a liver biopsy and all others with HCV infection. There is no further guidance in the policy regarding which priority levels receive treatment, or when. And again, despite this written policy of prioritization, in practice FDC provides almost no treatment with medication.

72.    Liver biopsies are generally not performed for FDC inmates with HCV.

73.    Because the standard of care is to treat everyone, without regard to the stage of the disease, FDC's written policy (even if it was followed) of only providing treatment to patients with the most advanced stages of the disease amounts to deliberate indifference to serious medical needs, in violation of the Eighth Amendment. It is not consistent with the standard of care. Delaying treatment until a patient is extremely sick has the perverse effect of withholding treatment from the patients who could benefit the most from it, because the treatment is less effective for patients with the most advanced stages of the disease.

74.    But even if the policy were adequate, the FDC does not follow it because it provides treatment to almost none of the HCV-positive inmates in its custody. Indeed, despite the fact that FDC knows of at least 4,790 patients with chronic HCV, as of July 6, 2016, FDC had treated only five with DAA drugs. Upon information and belief, FDC also knows, based on national estimates and the fact that FDC does not routinely test for HCV, that it is very likely that at least 14,700, and as many as 40,184, FDC inmates have HCV.

75.    In fact, the FDC's treatment rate is among the lowest in the country for which there is reported data.

76.    And since 2013, the year the FDA approved DAA medications that cure HCV, at least 160 FDC inmates have died of chronic liver disease, cirrhosis, and other diseases of the digestive system. Since HCV is the most common cause of liver

failure in the United States, it is likely that most of these deaths were due to chronic HCV. Upon information and belief, past and current practices of FDC are resulting in deaths that could have been prevented through treatment of HCV.

77.    Furthermore, assuming that prioritization were appropriate, FDC's policy is also inadequate because it relies on strict numerical cutoffs (and almost exclusively on the APRI score) rather than a holistic evaluation of the entire clinical picture to determine the level of fibrosis.

78.    And assuming that using numerical cutoffs were appropriate, FDC has set them so high that it precludes treatment for all but the most advanced cases of cirrhosis and fibrosis.

79.    Further, assuming that numerical cutoffs were appropriate and were set at appropriate levels, FDC is not even following them. Of the 4,790 patients identified by FDC as having chronic HCV, an analysis of their APRI scores and platelet counts indicates that almost 400 have probable cirrhosis, over 1,000 likely have advanced fibrosis, and over 1,700 likely have significant fibrosis. At the very least, all of these inmates should receive treatment.

80.    The FDC also unjustifiably delays providing HCV treatment, even though the standard of care requires treatment as early as possible. If DAA treatment is delayed until a patient has advanced fibrosis or cirrhosis (generally, the first two FDC priority levels), these medications can be significantly less effective. Moreover,

if DAA treatment is delayed until a patient develops decompensated cirrhosis (generally, the first FDC priority level), a liver transplant preceded or followed by DAA treatment is the only way to cure the patient.

81.    In practice, the FDC delays treatment for virtually all patients with HCV, regardless of their disease progression, until the patient is released from prison or dies.

82.    Moreover, FDC's policy does not address liver transplantation, the only possible cure for people with decompensated cirrhosis. Even if given DAA treatment, many of these patients will likely die without liver transplants.

83.    The FDC's policy does not address the need for liver cancer screening, which is standard medical practice once individuals have progressed to advanced fibrosis or cirrhosis. Unless there is regular surveillance to find cancers early and remove them surgically, liver cancer has a very dismal prognosis. Contrary to the proper and necessary medical procedures and the community standard of care, FDC has not been screening Plaintiff, and, upon information and belief, other HCV-positive FDC inmates with advanced fibrosis and cirrhosis, for liver cancer.

84.    The HSB does not include routine opt-out testing for HCV (i.e., requiring the test unless the inmate affirmatively opts out). Thus, FDC does not know the full number of FDC inmates who have HCV, even though, upon

information and belief, it knows the number to be much higher based on national estimates.

85.    Defendant FDC categorically withholds treatment from FDC inmates with HCV, but does not categorically withhold treatment from inmates with other similar diseases or conditions (such as HIV) or from other inmates without similar diseases or conditions.

86.    At all times relevant hereto, Defendant FDC enforced the above-described policies, practices, and customs despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. Defendant FDC has acted with deliberate indifference to the serious medical needs of FDC inmates with chronic HCV, including the serious medical needs of Plaintiff.

### The Private Entity Defendants Have Adopted and Enforced
### FDC's Unlawful Policy and Practice of Denying Treatment for HCV

87.    Defendant GEO operates the private prisons in Florida and does so under contract with Defendant FDC. Among others, Defendant GEO operates Bay CF, which is one of the prison facilities where Plaintiff was housed and denied treatment for his chronic HCV. When it comes to screening, evaluating, and treating HCV-infected inmates at GEO facilities, Defendant GEO utilizes the same policy and practice as Defendant FDC. In other words, the FDC policy detailed above is, in effect, also Defendant GEO's policy.

88.    At all times relevant hereto, Defendant GEO enforced the above-described policies, practices, and customs despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. Defendant GEO has acted with deliberate indifference to the serious medical needs of inmates with chronic HCV, including the serious medical needs of Plaintiff.

89.    Defendant Wellpath also utilizes the same policy and practice as Defendant FDC as it relates to screening, evaluating, and treating HCV-infected inmates at GEO facilities. Consequently, the FDC policy detailed above is, in effect, also Defendant Wellpath's policy.

90.    Defendant Wellpath was the health care provider at Bay CF during the time that Plaintiff was housed at that correctional facility. At all times relevant hereto, Defendant Wellpath enforced the above-described policies, practices, and customs despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. Defendant Wellpath has acted with deliberate indifference to the serious medical needs of inmates with chronic HCV, including the serious medical needs of Plaintiff.

91.    Defendants Corizon and Centurion, each in their turn, were healthcare companies contracted with Defendant FDC to provide healthcare services to FDC

inmates. Defendants Corizon and Centurion also utilizes the same policy and practice as Defendant FDC as it relates to screening, evaluating, and treating HCV-infected inmates at FDC, as well as GEO, facilities. Consequently, the FDC policy detailed above was, in effect, Defendant Corizon's policy and is currently Defendant Centurion's policy.

92.    Defendants Corizon and Centurion, each in their turn, provided healthcare services at Bay CF during the time that Plaintiff was housed at that facility. Moreover, Defendants Centurion provided healthcare services at Suwannee CI during the time Plaintiff was housed at that facility. At all times relevant hereto, Defendants Corizon and Centurion enforced the above-described policies, practices, and customs despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. Defendants Corizon and Centurion has acted with deliberate indifference to the serious medical needs of inmates with chronic HCV, including the serious medical needs of Plaintiff.

## Public Health Benefits of Treatment in Prison

93.    Providing expanded HCV screening and DAA treatment in Florida's prisons would greatly reduce the number of new HCV cases in the community. Curing the disease while people are in prison would prevent inmates from transmitting it when released, and testing would diagnose numerous individuals who

were unaware they were infected, thus allowing them to seek treatment once released.

94.    Studies have shown that providing DAA treatment to everyone with chronic HCV increases long term cost-savings. One study even found that restricting DAA treatment access until patients were in the later stages of fibrosis actually results in higher per-patient costs because, while it may be initially less expensive to delay administering DAAs, over the course of treatment, the follow-up care outweighs the initial costs.

95.    Thus, early DAA treatment has the potential to both drastically reduce the incidence of HCV in the general population and also to reduce the costs associated with serious complications from untreated HCV, such as liver transplants and liver cancer.

## Denial of HCV Treatment to Plaintiff Cloud

96.    Plaintiff tested positive for HCV in approximately 2003, shortly after his incarceration began in Florida. He has chronic HCV and cirrhosis of the liver.

97.    Plaintiff suffered from HCV throughout his incarceration and continues to suffer from HCV after his release in January 2019. Despite knowing that Plaintiff had chronic HCV, cirrhosis, and test results that entitled him to receive treatment, the Defendants have been deliberately indifferent to Plaintiff's serious medical needs

by denying him DAA treatment, which was the standard of care and the required HCV treatment under the United States Constitution and the ADA and RA.

98.    Plaintiff's chronic HCV is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver.

99.    Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment, and FDC diagnosed him with HCV, recorded some of his symptoms in his medical records, and enrolled him in the gastrointestinal chronic illness clinic.

100.    Plaintiff is regarded by FDC as having an impairment that substantially limits one or more major life activity, as FDC perceives him as having such an impairment, has diagnosed him with HCV, has recorded some of his symptoms in his medical records, and has enrolled him in the gastrointestinal chronic illness clinic.

101.   Plaintiff meets the essential eligibility requirements for the receipt of services, or the participation in programs or activities, provided by FDC, including but not limited to medical services.

102.   Defendant FDC's policy is to treat inmates with HCV, such as Plaintiff, based on their priority level. The priority level an inmate is given depends in large part on that inmate stage and progression of liver disease.

103.   Plaintiff was first diagnosed with HCV in approximately August of 2003, while at Bay CF. Plaintiff requested treatment for HCV then, and was told that he did not meet the requirements for treatment.

104.   Plaintiff continued to request treatment at every annual checkup, but to no avail. He was told that he did not qualify for treatment, that his liver was functioning normally, and that his HCV was being followed closely. However, upon information and belief, the Defendants did not monitor or follow Plaintiff's chronic condition closely. Instead, the Defendants failed to perform the necessary tests that would have indicated the stage and progression of Plaintiff's disease and whether he met the requirements for treatment under FDC's policy. In fact, even though FDC prioritized inmates for treatment based on their METAVIR fibrosis stage, the first time Plaintiff was tested for and received a METAVIR fibrosis stage was in June of 2018, which showed he was an F4 and thus had cirrhosis of the liver.

105.    Plaintiff has made numerous requests for treatment as well as for adequate testing to determine whether his liver disease has progressed to a stage that would qualify him for treatment under FDC's policy. Not only did the Defendants' refuse to treat Plaintiff with the only medication that could cure his HCV, which would conform to the prevailing standard of care that treatment should be provided regardless of the stage of liver disease, but it also failed to properly stage Plaintiff's disease, which would have shown that treatment was clinically indicated several years before Plaintiff was approved for DAA treatment in 2018.

106.    In July 2018, Plaintiff was finally "approved" for treatment. This approval was apparently based on the results of Plaintiff's HCV FibroSURE test, which indicated that Plaintiff was an F4 and had cirrhosis. This was the first time that an HCV FibroSURE test was conducted on Plaintiff. Prior to June 2018, Plaintiff was told that his liver was fine, functioning normally, and that he did not meet the requirements for treatment.

107.    In or about September of 2018, Plaintiff was transferred to Suwannee CI, an FDC facility, for the purpose of receiving HCV treatment. He was told that he had to be transferred to an FDC facility because DAA treatment is not administered at a GEO-operated facility.

108.    Despite approving Plaintiff for treatment, the Defendants ultimately refused to treat him before his release. After delaying and denying Plaintiff treatment

for years, the Defendants then claimed, shortly after approving him for treatment, that Plaintiff was not eligible due to his release date. Clearly, the Defendants had no intention of treating Plaintiff, instead leading him to believe that he would receive such treatment.

109.    Plaintiff repeatedly requested an accommodation for his HCV—that is, treatment which could have cured his disability. This request for DAA treatment was a request for a reasonable accommodation in that DAAs were and are the only medication that could result in a cure for his disability. That is, DAAs were and are the only drug that is capable of clearing HCV from Plaintiff's body. However, the Defendants denied providing Plaintiff with such treatment. When the Defendants finally determined that Plaintiff had cirrhosis and should be treated, they turned around and deemed him ineligible for treatment because of his release date. Such denial constituted deliberate indifference because the denial of the HCV treatment was due, in part, to the cost of the medicine.

110.    Plaintiff's request for DAA treatment for HCV was a reasonable request and a reasonable accommodation as the Defendants were constitutionally required to provide such medicine and treatment. DAAs were the necessary treatment under the prevailing standard of care for treating individuals with HCV. Failing to provide the DAAs resulted in Plaintiff's denial to meaningful access to prison programs, services, and activities. *See infra*. Additionally, providing Plaintiff

with no treatment or inadequate treatment prevented Plaintiff from accessing other services within the prison, including the prison yard and participation in recreational activities at the prison.

111.   Despite Plaintiff's requests for accommodations and treatment since being diagnosed with HCV in 2003, and despite being approved for treatment 2018, the Defendants refused to provide Plaintiff with DAA treatment. Even after Plaintiff was approved for treatment in July 2018, the Defendants continued to delay and deny him DAAs until such time that Defendants could deem him ineligible for treatment due to his release date.

112.   By the time Plaintiff was released from prison in January 2019, it was clear he had developed cirrhosis of the liver. Indeed, as of at least June 2018, Plaintiff's test results showed that he was an F4 (METAVIR) and had an APRI score greater than 1.2, both of which indicate cirrhosis of the liver. As a result of the Defendants refusal to provide treatment, Plaintiff has suffered and continues to suffer from severe and permanent liver damage, which may have been prevented if not for the Defendants' unconstitutional denial of treatment.

**COUNT I**
**42 U.S.C. § 1983 – EIGHTH AMENDMENT**
**(Against Defendants Cherry and Lindsey)**

113.   Plaintiff incorporates and re-alleges Paragraphs 1 through 111 as if fully set forth herein.

114.    This count is brought through 42 U.S.C. § 1983 and against Defendants Cherry and Lindsey for violations of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

115.    At all times relevant hereto, Defendants Cherry and Lindsey acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendants Cherry and Lindsey are sued in their individual capacities.

116.    Plaintiff had a serious medical need as he was diagnosed with chronic HCV. Defendants Cherry and Lindsey were subjectively aware that Plaintiff had chronic HCV and suffered from symptoms associated with chronic HCV. Plaintiff's condition and serious medical need was so obvious that even a layperson would easily recognize the necessity for medical attention and treatment.

117.    Despite qualifying and being approved for treatment, Defendants Cherry and Lindsey refused to provide Plaintiff with DAAs, the only treatment and cure for HCV under the prevailing standard of care.

118.    Defendants Cherry and Lindsey intentionally refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that their actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

119.   Defendants Cherry and Lindsey have caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

120.   Defendants Cherry and Lindsey's refusal to provide treatment worsened Plaintiff's serious medical condition. Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendants Cherry and Lindsey knew of this substantial risk of serious harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would alleviate those risks and harms. Thus, Defendants Cherry and Lindsey have been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his chronic HCV.

121.   By denying Plaintiff the medically needed DAA treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendants Cherry and Lindsey imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

122.   Defendants Cherry and Lindsey's denial of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

123.   Defendants Cherry and Lindsey's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

124.   Plaintiff did not receive the constitutionally-required DAA treatment because of the cost of the treatment.

125.   Plaintiff suffered damages as a direct and proximate result of Defendants Cherry and Lindsey's constitutional violation, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, the Plaintiff, Charles Cloud, demands judgment against Defendants Cherry and Lindsey for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

### COUNT II
### 42 U.S.C. § 1983 – *MONELL* CLAIM
### (Against Defendants GEO, Wellpath, Corizon, and Centurion)

126.   Plaintiff incorporates and re-alleges Paragraphs 1 through 111 as if fully set forth herein.

127.   This count is brought through 42 U.S.C. § 1983 and against Defendants GEO, Wellpath, Corizon, and Centurion for violations of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

128.   At all times relevant hereto, Defendants GEO, Wellpath, Corizon, and Centurion and their policymakers knew about and enforced policies, practices,

and/or custom that exhibited deliberated indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. Defendants GEO, Wellpath, Corizon, and Centurion, acting through their employees and agents, intentionally delayed, failed, and refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that their actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

129.   Defendants GEO, Wellpath, Corizon, and Centurion have caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

130.   The refusal to provide treatment by Defendants GEO, Wellpath, Corizon, and Centurion, acting through their employees and agents, worsened Plaintiff's serious medical condition. Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendants GEO, Wellpath, Corizon, and Centurion knew of this substantial risk of serious harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would alleviate those risks and harms. Defendants GEO, Wellpath, Corizon, and Centurion have been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his chronic HCV.

131.   By denying Plaintiff the medically needed DAA treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendants GEO, Wellpath, Corizon, and Centurion imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

132.   Defendants GEO, Wellpath, Corizon, and Centurion's delay and denial of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

133.   Defendants GEO, Wellpath, Corizon, and Centurion's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

134.   Plaintiff did not receive the constitutionally-required DAA treatment because of the cost of the treatment.

135.   The constitutional violations of Defendants GEO, Wellpath, Corizon, and Centurion, through the actions and omissions of its employees and agents, were directly and proximately caused by policies, practices, and/or customs implemented and enforced by Defendants GEO, Wellpath, Corizon, and Centurion.

136.   As a direct and proximate result of the policies, practices, customs, and deliberate indifference of Defendants GEO, Wellpath, Corizon, and Centurion, Plaintiff has suffered damages, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, the Plaintiff, Charles Cloud, demands judgment against Defendants GEO, Wellpath, Corizon, and Centurion for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

## COUNT III
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA)
### (Against Defendant FDC)

137.   Plaintiff incorporates and re-alleges paragraphs 1 through 111 as if fully set forth herein.

138.   This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101, *et seq.* and 42 U.S.C. §§ 12131–12134, and its implementing regulations.

139.   The ADA prohibits public entities from discriminating against individuals with disabilities in their services, programs, and activities. 42 U.S.C. §§ 12131–12134; *see also* 28 C.F.R. §§ 35.130. In other words, the ADA impose an affirmative duty on public entities to create policies and procedures to prevent discrimination based on disability.

140.   Defendant FDC is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

141.   Plaintiff had chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the

digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b). This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

142.   Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

143.   Plaintiff is regarded by FDC as having an impairment that substantially limits one or more major life activity, as FDC perceives them as having such an impairment. 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f). Defendant FDC has subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

144.   Plaintiff was a qualified individual with a disability because he met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant FDC, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

145.  By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC excluded Plaintiff from participation in, and denied him the benefits of, FDC services, programs, and activities (such as medical services) by reason of his disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

146.  By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC subjected Plaintiff to discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

147.  DAAs are the only effective medical treatment available for HCV under the prevailing standard of care, and is the constitutionally-required treatment under the Eighth Amendment. Plaintiff requested DAA treatment for his HCV, which was a request for a reasonable accommodation for his HCV. By denying or delaying in providing Plaintiff DAA treatment, Defendant FDC refused or failed to provide Plaintiff a reasonable accommodation for his request for treatment of his HCV in violation of Title II of the ADA.

148.  Defendant FDC failed to provide Plaintiff with equal access to and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1).

149.  Defendant FDC's refusal to provide Plaintiff with the DAAs also denied Plaintiff access to other prison services, programs, and activities that other

inmates routinely access. For example, Plaintiff was unable to participate in recreation and other physical exercise. Further, in the event of a prison fight, because of his physical condition, Plaintiff would be unable to escape quickly. Plaintiff's inability to participate in recreational activities in the prison yard isolates Plaintiff and denies him meaningful access to these prison services, programs, and activities.

150.    Defendant FDC utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination and that defeated or substantially impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

151.    DAAs were readily available to Defendant FDC during this time period and yet it categorically refused to provide Plaintiff with treatment that the medical community deems essential.

152.    Defendant FDC denied and delayed providing Plaintiff with the necessary treatment and reasonable accommodation for his HCV because of the cost of the treatment and accommodation.

153.    Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff. Such violations include but are not limited to (a) FDC's refusal to provide Plaintiff with the only medical treatment available under the prevailing standard care, (b) FDC's refusal to provide Plaintiff with DAA treatment because the cost of such

treatment was too expensive, and (c) to the extent it lacked sufficient funds to purchase and treat HCV-infected inmates like Plaintiff with DAAs, FDC's refusal or failure to even request adequate funding from the Florida Legislature.

154. Had Defendant FDC not delayed but instead provided Plaintiff with DAA treatment and the reasonable accommodation he requested from 2003 through his release in 2019, Plaintiff would not have suffered additional injuries, including both physical injuries and emotional pain and suffering.

155. As a direct and proximate cause of Defendant FDC's actions and omissions, Plaintiff has suffered and continues to suffer from harm and violation of his ADA rights.

WHEREFORE, the Plaintiff, Charles Cloud, demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## COUNT IV
## SECTION 504 OF THE REHABILITATION ACT (RA)
### (Against Defendant FDC)

156. Plaintiff incorporates and re-alleges paragraphs 1 through 111 as if fully set forth herein.

157.   This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, *et seq.* and 29 U.S.C. § 791–794, *et seq.*, and its implementing regulations.

158.   Section 504 of the RA prohibits discrimination against persons with disabilities by any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

159.   Defendant FDC is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794.

160.   Defendant FDC excluded Plaintiff—a qualified individual with a disability—from participation in, and denied him the benefits of, programs or activities solely by reason of his disability. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20); 28 C.F.R. § 42.503(a).

161.   Defendant FDC subjected Plaintiff—a qualified individual with a disability—to discrimination. 29 U.S.C. § 794(a).

162.   Defendant FDC denied Plaintiff—a qualified handicapped person—the opportunity accorded to others to participate in programs and activities. 28 C.F.R. § 42.503(b)(1).

163.   Defendant FDC utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or

substantially impair accomplishment of the objectives of FDC's programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3).

164.   Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

165.   As a direct and proximate cause of Defendant FDC's exclusion and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his RA rights.

WHEREFORE, the Plaintiff, Charles Cloud, demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts alleged above.

DATED this 10th day of April, 2019.

Respectfully submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ Ryan J. Andrews*
RYAN J. ANDREWS (FBN: 0104703)
ryan@andrewslaw.com

*/s/ John M. Vernaglia*
JOHN M. VERNAGLIA (FBN: 1010637)
john@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiff*