# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

CHARLES CLOUD,

       Plaintiff,

v.                            CASE NO.: 4:19-cv-00161-WS-CAS

THE FLORIDA DEPARTMENT OF
CORRECTIONS, an agency of the
State of Florida, THE GEO GROUP,
INC., a Florida Corporation,
WELLPATH LLC, a Delaware
Corporation, CORIZON, LLC, a
Missouri Limited Liability Company,
CENTURION OF FLORIDA, LLC, a
Florida Limited Liability Company,
DANIEL CHERRY, an individual,
and CHARLES GREGORY
LINDSEY, an individual,

       Defendants.

_____/

## **FIRST AMENDED COMPLAINT**

    The Plaintiff, Charles Cloud ("Cloud"), by and through the undersigned

counsel, hereby sues the Florida Department of Corrections ("FDC"), The GEO

Group, Inc. ("GEO"), Wellpath LLC[1] ("Wellpath"), Corizon, LLC ("Corizon"),

---

[1] Wellpath was formerly known as Correct Care Solutions, LLC ("CCS"). The name changed occurred after CCS merged with another healthcare company in 2019.

Centurion of Florida, LLC ("Centurion"), Daniel Cherry ("Cherry"), an individual, and Charles Gregory Lindsey ("Lindsey"), an individual, and alleges as follows:

## INTRODUCTION

1. This is a civil rights action brought by Plaintiff Cloud seeking monetary damages for the Defendants' violations of Plaintiff's rights secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983, the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* The Defendants violated Plaintiff's rights by denying him the treatment that was required and necessary to cure Plaintiff's infection with Hepatitis C Virus (HCV), which constituted deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment and discrimination on the basis of disability in violation of the Americans with Disabilities Act and the Rehabilitation Act.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under the Constitution of the United States.

3. Jurisdiction and venue are proper in the Northern District of Florida (Tallahassee Division) in that the FDC is headquartered with its principle place of

business in Leon County, Florida, and the alleged acts of misconduct giving rise to this cause of action occurred within the Northern District of Florida.

4.    The claims alleged herein are brought within the applicable statute of limitations.

5.    The Plaintiff has complied with all conditions precedent and, if applicable, has properly exhausted all administrative remedies prior to filing this action. On multiple occasions, Plaintiff filed grievances at the facilities he was detained. In particular, Plaintiff filed an informal grievance with medical in July 2018 requesting treatment for HCV. In response to his grievance, Plaintiff was "approved" for treatment, thereby satisfying the exhaustion requirement. Alternatively, this action was filed after Plaintiff's release from confinement and, therefore, the exhaustion requirement does not apply to Plaintiff. In other words, Plaintiff, a former prisoner, is not required to comply with the exhaustion requirement of the Prison Litigation Reform Act ("PLRA").

## THE PARTIES

### Charles Cloud

6.    Plaintiff Cloud brings this action for violation of the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. Plaintiff Cloud is a former inmate who was incarcerated in the State of Florida.

During his incarceration from May 2003 to January 2019, Plaintiff was housed at both state and private prison facilities throughout Florida.

### The GEO Group, Inc.

7.     Defendant GEO is a Florida-based company and private prison owner and operator. Defendant GEO operates private correctional facilities in Florida pursuant to contracts entered into with the State of Florida and Defendant FDC.

8.     Bay CF is a private correctional facility in Florida operated by Defendant GEO under contract with the State of Florida and Defendant FDC. Defendant GEO operated Bay CF at all times relevant to this Complaint.

### Wellpath LLC

9.     Defendant Wellpath, formerly known as Correct Care Solutions, LLC,[2] is a healthcare company contracted with Defendant GEO to provide healthcare services to inmates detained at private correctional facilities in Florida. At all times relevant hereto, Defendant Wellpath provided healthcare services at Bay CF, one of the facilities where Plaintiff was housed and denied treatment for his HCV.

### Corizon, LLC

10.     Defendant Corizon is a Missouri-based company and provider of correctional healthcare. Pursuant to a contract with FDC, Defendant Corizon

---

[2] In January 2019, Correct Care Solutions, LLC changed its name to Wellpath LLC as the result of a merger with Correctional Medical Group Companies, Inc.

provided healthcare services to inmates detained at state and private correctional facilities in Florida, including Bay CF where Plaintiff was housed and denied HCV treatment, from October 2012 until May 2016. In addition to Defendant FDC, Defendant Corizon was responsible for the healthcare services provided to Plaintiff from October 2012 to May 2016.

### Centurion of Florida, LLC

11.     Defendant Centurion is a Florida-based company and provider of correctional healthcare. In approximately February 2016, Defendant Centurion contracted with Defendant FDC to provide healthcare services to inmates detained at state and private correctional facilities in Florida, including Bay CF and Suwannee Correction Institution ("Suwannee CI") where Plaintiff was housed and denied HCV treatment. Centurion replaced Corizon as FDC's healthcare services provider. From February 2016 to Plaintiff's release in January 2019, Defendants Centurion and FDC were responsible for the healthcare services provided to Plaintiff.

12.     Defendants GEO, Wellpath, Corizon, and Centurion are hereinafter referred to collectively as the "Private Entity Defendants."

### The Florida Department of Corrections

13.     Defendant FDC is an agency of the State of Florida that owns and operates correctional facilities in the state, and which receives federal funds to operate its agency. Defendant FDC is headquartered in Leon County, Florida and

therefore venue is proper in Tallahassee, Florida. Defendant FDC is responsible for overseeing the operations of its contractors, including the Private Entity Defendants. At all times relevant hereto, Defendant FDC owned and operated Suwannee CI, one of the facilities where Plaintiff was housed and denied treatment for his HCV.

### Daniel Cherry

14.    Defendant Cherry is a licensed osteopathic physician who worked at Bay CF all times relevant hereto. Upon information and belief, Defendant Cherry was the Regional Medical Director for Defendant Corizon and, in approximately 2016 when Centurion replaced Corizon as FDC's healthcare provider, became the Statewide Medical Director for Defendant Centurion. Defendant Cherry refused to treat Plaintiff's HCV despite being aware of Plaintiff's serious medical condition and disability.

15.    At all times relevant hereto, Defendant Cherry acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendant Cherry is sued in his individual capacity.

### Charles Gregory Lindsey

16.    Defendant Lindsey is a licensed, registered nurse who worked at Bay CF at all times relevant hereto. Defendant Lindsay was employed by Defendant Wellpath (formerly CCS) as the Health Services Administrator ("HSA") and worked at Bay CF at all times relevant hereto. Defendant Lindsey has been a licensed,

registered nurse for more than twenty years. Defendant Lindsey refused to treat Plaintiff's HCV despite being aware of Plaintiff's serious medical condition and disability.

17.     At all times relevant hereto, Defendant Lindsey acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendant Lindsey is sued in his individual capacity.

## FACTS

### Background Information on Hepatitis C Virus

18.     Hepatitis C is a blood borne disease caused by the Hepatitis C Virus ("HCV"). The virus causes inflammation that damages liver cells and is a leading cause of liver disease and liver transplants.

19.     HCV can be either acute or chronic. In people with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. Chronic HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure. Fifty (50) to eighty (80) percent of infected people will develop chronic HCV.

20.     Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body.

Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

21.     People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring. Scar tissue cannot perform the job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity. Fibrosis can also lead to hepatocellular carcinoma (liver cancer).

22.     When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. Of those with chronic HCV, the majority will develop chronic liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe.

23.     Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased risk of infection, seizures, and extreme fatigue. Most of these complications can occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

24.     Abdominal ascites can require paracentesis, a procedure wherein a needle is inserted into the abdomen to drain the fluid. Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

25.     Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible. Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

26.     Chronic HCV is, as a matter of law, a serious medical need.

### General Prevalence of HCV

27.     Approximately 2.7 to 3.9 million Americans have chronic HCV.

28.     In 2000, the United States Surgeon General called HCV a "silent epidemic," and estimated that as much as two percent of the adult U.S. population had HCV.

29.     In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

30.     Approximately 19,000 people die of HCV-caused liver disease every year in the United States.

31.     HCV is the leading indication for liver transplants in the United States.

## HCV in Prison

32.    The prevalence of HCV in prison is much higher than in the general population. It is estimated that between 16% and 41% of the United States' jail and prison population has HCV. Thus, incarceration is a risk factor for HCV.

33.    Defendant FDC has reported to the media and researchers that 5,000 to 5,272 of its approximately 98,000 inmates have HCV. As of August 8, 2016, Defendant FDC listed 4,797 inmates as having HCV in its internal records. As of late-2017, it was estimated that at least 7,000 inmates are infected with HCV.

34.    In fact, because it is estimated that between 16% and 41% of incarcerated people have HCV, it is likely that between 14,700 and 40,184 FDC inmates have HCV. The true number is likely at the higher end of that spectrum because of the high prevalence of HCV in Florida: Between 2009 and 2013, rates of acute HCV in Florida increased by 133%.

## Standard of Care for HCV

35.    For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications and sometimes required injections, had a long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not

all drug regimens worked for all types of HCV, and many could not be given to patients with other comorbid diseases.

36.     In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications, called direct-acting antiviral ("DAA") drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

37.     As of late-2013, DAA drugs became available for HCV patients.

38.     These DAA drugs have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally (commonly a once-daily pill) rather than by injections. They have truly revolutionized the way HCV is treated.

39.     Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime only helped roughly one third of patients.

40.     For HCV, a "cure" is defined as a sustained virologic response ("SVR")—i.e., no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

41.     In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org.

42.     The HCV Guidance set forth the medical standard of care for the treatment of HCV, which is well-established in the medical community.

43.     In 2014, the AASLD/IDSA panel, through the HCV Guidance, recommended treatment with DAA drugs for all persons with chronic HCV. Since 2014, this has been the standard of care for the treatment of HCV, and it reflects the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

44.     Under this standard of care, treatment with DAA drugs is expected to cure nearly all infected persons.

45.     The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70%

reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

46.     Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

## Public Health Benefits of Treatment in Prison

47.     Providing expanded HCV screening and DAA treatment in Florida's prisons would greatly reduce the number of new HCV cases in the community. Curing the disease while people are in prison would prevent inmates from transmitting it when released, and testing would diagnose numerous individuals who were unaware they were infected, thus allowing them to seek treatment once released.

48.     Studies have shown that providing DAA treatment to everyone with chronic HCV increases long term cost-savings. One study even found that restricting DAA treatment access until patients were in the later stages of fibrosis actually results in higher per-patient costs because, while it may be initially less expensive to delay administering DAAs, over the course of treatment, the follow-up care outweighs the initial costs.

49.     Thus, early DAA treatment has the potential to both drastically reduce the incidence of HCV in the general population and also to reduce the costs

associated with serious complications from untreated HCV, such as liver transplants and liver cancer.

### Delay and Denial of HCV Treatment to Plaintiff Cloud

50.     From late-2013, when DAAs first became available, until approximately October of 2017, Defendant FDC and its medical contractors, including Defendants Corizon and Centurion, had a policy, practice, and custom of not providing DAA drugs to inmates with HCV.

51.     At all times relevant hereto, Defendant FDC enforced such policy, practice, and custom despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant FDC has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC inmates with HCV.

52.     From approximately October 2012 to May 2016, Defendant Corizon enforced such policy, practice, and custom despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant Corizon has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC inmates with HCV.

14

53.    Defendant Centurion replaced Defendant Corizon as FDC's contracted healthcare services provider in approximately May of 2016. At all relevant times thereafter, Defendant Centurion enforced such policy, practice, and custom despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant Centurion has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC inmates with HCV.

54.    Defendant GEO operates the private prisons in Florida and does so under contract with Defendant FDC. Among other facilities, Defendant GEO operates Bay CF, which is one of the prison facilities where Plaintiff was housed and denied treatment for his chronic HCV. When it comes to screening, evaluating, and treating HCV-infected inmates at GEO facilities, Defendant GEO has utilized the same policy, practice, and custom of not providing DAA drugs to inmates with HCV as Defendants FDC, Corizon, and Centurion.

55.    At all times relevant hereto, Defendant GEO enforced such policy, practice, and custom despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so,

Defendant GEO has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC inmates with HCV.

56. Defendant Wellpath was the health care provider at Bay CF during the time that Plaintiff was housed at that correctional facility. Defendant Wellpath utilized the same policy, practice, and custom as Defendant FDC as it relates to screening, evaluating, and treating HCV-infected inmates at GEO facilities. Consequently, Defendant Wellpath also had a policy, practice, and custom of not providing DAA drugs to inmates with HCV.

57. At all times relevant hereto, Defendant Wellpath enforced such policy, practice, and custom despite knowing that the failure to provide DAA medications to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant Wellpath has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of FDC inmates with HCV.

58. At all times relevant hereto, Defendant FDC and the Private Entity Defendants failed and/or refused to provide DAA drugs to thousands of inmates with HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical needs of inmates with chronic HCV in Florida.

59. As a result of Defendant FDC and the Private Entity Defendants' refusal to provide DAA drugs to inmates, over 100 inmates died of untreated HCV and hundreds more suffered irreparable liver damages.

60. Defendant FDC and the Private Entity Defendants also unjustifiably delayed providing HCV treatment, even though the standard of care requires treatment as early as possible. If DAA treatment is delayed until a patient has advanced fibrosis or cirrhosis (generally, the first two FDC priority levels), these medications can be significantly less effective. Moreover, if DAA treatment is delayed until a patient develops decompensated cirrhosis (generally, the first FDC priority level), a liver transplant preceded or followed by DAA treatment is the only way to cure the patient.

61. At all times relevant hereto, Defendant FDC categorically withheld treatment from FDC inmates with HCV but did not categorically withhold treatment from inmates with other similar diseases or conditions (such as HIV) or from other inmates without similar diseases or conditions.

62. Defendant FDC and the Private Entity Defendants refused to provide FDC inmates, including the Plaintiff, with the necessary (and only) treatment for his HCV because of the cost of the treatment.

63.     Plaintiff has been incarcerated in the Florida prison system since May 2003. Shortly after his incarceration began, and during his initial health screening, Plaintiff was diagnosed with HCV by FDC medical staff.

64.     Starting in May 2003 up to his release in January 2019, Plaintiff regularly received blood tests that consistently reported high Aspartate Aminotransferase (AST) and Alanine Aminotransferase (ALT) levels, which indicated that Plaintiff had chronic HCV and progressive liver disease.

65.     Plaintiff requested HCV treatment in 2003 but was told that he did not meet FDC's guidelines for treatment. Thereafter and up to his release, Plaintiff regularly inquired about the condition of his liver and requested HCV treatment, but was consistently denied such treatment. Moreover, Plaintiff was not adequately informed of the severity of his liver disease and the substantial health risks associated with chronic HCV. In fact, on one occasion, Plaintiff was told that he could always sign a refusal if he did not want to wait for his lab results and, ultimately, treatment to cure his HCV.

66.     From at least January 2017 through July 2018, Plaintiff's labs indicated that his Aspartate Aminotransferase (AST) to Platelet Ratio Index ("APRI") score was above 0.7, which suggests that Plaintiff had severe fibrosis or even cirrhosis.

67.     In late-2003, Plaintiff was enrolled in the chronic illness clinic because of his HCV. By mid-2005, Plaintiff began visiting the gastrointestinal clinic. At each visit, Plaintiff was merely given blood tests but was never provided any treatment.

68.     From late-2013, when DAAs first became available, until his release in January of 2019, Plaintiff was only given routine blood draws to monitor his HCV. Each time that Plaintiff requested treatment, he was told that he did not meet the requirements for treatment under FDC's guidelines.

69.     Whether an FDC inmate received treatment with DAAs almost exclusively relies on the inmate's Metavir or fibrosis score (F0-F4). Nonetheless, the Defendants failed to perform the necessary tests that would have indicated the stage and progression of Plaintiff's HCV and whether he met the requirements for treatment under FDC's guidelines.

70.     It was not until June of 2018, more than four years after DAAs became available, that Plaintiff was given a FibroSure test, which indicated that he had a fibrosis score of F4 (cirrhosis).

71.     Once it was determined that he was an F4 and had cirrhosis, Plaintiff again requested treatment with DAA drugs in July of 2018. As a result, Plaintiff was "approved" for treatment.

72.     Thereafter, Plaintiff was transferred from Bay CF to Suwannee CI. He was led to belief that the purpose of the transfer was so that he could receive the

treatment that would cure his chronic liver disease. In fact, Plaintiff was told that he had to be transferred to Suwannee CI, an FDC facility, because DAAs could not be administered at Bay CF, a GEO-operated facility. However, Plaintiff never received treatment with DAAs at Bay CF, Suwannee CI, or any correctional facility.

73.    At Suwannee CI, Plaintiff was told that more testing was required before he could be referred for treatment. In particular, Plaintiff was told that the genotype of his HCV needed to be determined before he could receive treatment. However, Plaintiff's genotype was determined several years earlier, in 2014. Upon information and belief, this was simply another delay tactic designed to avoid the responsibility of having to treat Plaintiff's HCV and pay for his costly DAA drug regimen.

74.    In October 2018, several months after being transferred to Suwannee CI, Plaintiff was informed in response to an inmate request that he was not eligible for HCV treatment due to his release date. In other words, when the time came that FDC and its medical contractors could no longer deny that Plaintiff qualified for treatment under FDC's guidelines, FDC found another way to avoid having to provide Plaintiff with DAAs by deeming him ineligible because of his release date.

75.    Plaintiff was denied HCV treatment for non-medical reasons. Such denial amounted to deliberate indifference to Plaintiff's chronic HCV—a serious medical need.

76.     Plaintiff had chronic HCV. Despite knowing that Plaintiff had chronic HCV and test results that entitled him to receive treatment, the Defendants have been deliberately indifferent to Plaintiff's serious medical needs by denying him DAA treatment, which was the standard of care and the required HCV treatment under the Eighth Amendment and the ADA and RA.

77.     Throughout his entire incarceration, Plaintiff repeatedly requested HCV treatment, both verbally and through the grievance process. However, Plaintiff was repeatedly told that he did not qualify for treatment, that his liver was fine, and that treatment was "not clinically indicated." Instead, the Defendants' merely continued to monitor Plaintiff's chronic condition without providing him with the necessary treatment to cure his HCV. Despite being initially diagnosed with HCV by FDC staff and progressing to F4 cirrhosis of the liver, Plaintiff was never administered DAA drugs by the Defendants to cure his chronic HCV.

78.     While incarcerated, Plaintiff filed numerous inmate requests and grievances in which he complained of his symptoms and requested HCV treatment. Despite his request being approved in 2018, Plaintiff never received the treatment he was entitled to, and desperately needed, to cure his chronic HCV.

79.     Defendant FDC's policy is to treat inmates with HCV, such as Plaintiff, based on their priority level. The priority level an inmate is given depends in large part on that inmate stage and progression of liver disease.

80.     While on the waiting list, Plaintiff has made numerous requests for treatment or, at the very least, adequate testing to determine whether his liver disease has progressed to a stage that would qualify him for treatment under Defendant FDC's policy. Not only was Plaintiff denied treatment with the only medication that could cure his HCV, which would have conformed to the prevailing standard of care that treatment should be provided regardless of the stage of liver disease, but he was also denied proper staging of his disease, which would have shown that treatment was clinically indicated several years before Plaintiff was declared ineligible due to his release date.

81.     Plaintiff has repeatedly requested an accommodation for his HCV— that is, treatment which could result in a cure for his disability. This request for DAA treatment was a request for a reasonable accommodation in that DAAs were and are the only medication that could result in a cure for his disability. That is, DAAs were and are the only drug that is capable of clearing HCV from Plaintiff's body. However, the Defendants denied providing Plaintiff with such treatment. Such delay and denial constituted deliberate indifference because the denial of the HCV treatment was due, in part, to the cost of the medicine.

82.     Plaintiff's request for DAA treatment for HCV was a reasonable request and a reasonable accommodation as the Defendants were constitutionally required to provide such medicine and treatment. DAAs were the necessary

treatment under the prevailing standard of care for treating individuals with HCV. Failing to provide the DAAs resulted in Plaintiff's denial to meaningful access to prison programs, services, and activities. *See infra*. Additionally, providing Plaintiff with no treatment or inadequate treatment prevented Plaintiff from accessing other services within the prison, including the prison yard and participation in recreational activities at the prison.

83.     Despite Plaintiff's requests for accommodations and treatment since 2003, and despite being qualified for treatment, the Defendants refused to provide Plaintiff with DAA treatment during his incarceration.

84.     Plaintiff has suffered serious and substantial injuries, including irreparable damage to his liver, as a result of the Defendants' delay in providing adequate medical care and treatment.

85.     Plaintiff has suffered from a variety of symptoms associated with chronic HCV, including but not limited to surface bleeding, dry and itchy skin, nausea, confusion, increase weakness, abdominal pain, and joint pain.

86.     Plaintiff also suffered from extreme fatigue caused by his untreated HCV. Some days he was unable to get out of bed. Moreover, as his condition worsened, Plaintiff's legs and ankles began to swell significantly, which was very painful.

87.     The irreparable damage suffered by Plaintiff may have been prevented if not for the Defendants' unconstitutional delay and denial of treatment. Plaintiff continues to suffer damages as a result of the Defendants' deliberate indifference to his serious medical need (HCV).

## COUNT I
### 42 U.S.C. § 1983 – EIGHTH AMENDMENT
### (Against Defendants Cherry and Lindsey)

88.     Plaintiff incorporates and re-alleges Paragraphs 1 through 87 as if fully set forth herein.

89.     This count is brought through 42 U.S.C. § 1983 and against Defendants Cherry and Lindsey for violations of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

90.     At all times relevant hereto, Defendants Cherry and Lindsey acted under color of state law and intentionally deprived Plaintiff of his rights under the United States Constitution. Defendants Cherry and Lindsey are sued in their individual capacities.

91.     Plaintiff had a serious medical need as he was diagnosed with chronic HCV. Defendants Cherry and Lindsey were subjectively aware that Plaintiff had chronic HCV and suffered from symptoms associated with chronic HCV. Plaintiff's condition and serious medical need was so obvious that even a layperson would easily recognize the necessity for medical attention and treatment.

92.     Despite qualifying and being approved for treatment, Defendants Cherry and Lindsey refused to provide Plaintiff with DAAs, the only treatment and cure for HCV under the prevailing standard of care.

93.     Defendants Cherry and Lindsey intentionally refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that their actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

94.     Defendants Cherry and Lindsey have caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

95.     Defendants Cherry and Lindsey's refusal to provide treatment worsened Plaintiff's serious medical condition. Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendants Cherry and Lindsey knew of this substantial risk of serious harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would alleviate those risks and harms. Thus, Defendants Cherry and Lindsey have been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his HCV.

96.     By denying Plaintiff the medically needed DAA treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendants Cherry and

Lindsey imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

97. Defendants Cherry and Lindsey's denial of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

98. Defendants Cherry and Lindsey's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

99. Plaintiff did not receive the constitutionally-required DAA treatment because of the cost of the treatment.

100. Plaintiff suffered damages as a direct and proximate result of Defendants Cherry and Lindsey's constitutional violation, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, the Plaintiff, Charles Cloud, demands judgment against Defendants Cherry and Lindsey for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

## COUNT II
### 42 U.S.C. § 1983 – *MONELL* CLAIM
### (Against Defendants GEO, Wellpath, Corizon, and Centurion)

101. Plaintiff incorporates and re-alleges Paragraphs 1 through 87 as if fully set forth herein.

102.    This count is brought through 42 U.S.C. § 1983 and against Defendants GEO, Wellpath, Corizon, and Centurion for violations of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

103.    At all times relevant hereto, Defendants GEO, Wellpath, Corizon, and Centurion and their policymakers knew about and enforced policies, practices, and/or custom that exhibited deliberated indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. Defendants GEO, Wellpath, Corizon, and Centurion, acting through their employees and agents, intentionally delayed, failed, and refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that their actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

104.    Defendants GEO, Wellpath, Corizon, and Centurion have caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

105.    The refusal to provide treatment by Defendants GEO, Wellpath, Corizon, and Centurion, acting through their employees and agents, worsened Plaintiff's serious medical condition. Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendants GEO, Wellpath, Corizon, and Centurion knew of this substantial risk of serious

harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would alleviate those risks and harms. Defendants GEO, Wellpath, Corizon, and Centurion have been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his chronic HCV.

106.   By denying Plaintiff the medically needed DAA treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendants GEO, Wellpath, Corizon, and Centurion imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

107.   Defendants GEO, Wellpath, Corizon, and Centurion's delay and denial of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

108.   Defendants GEO, Wellpath, Corizon, and Centurion's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

109.   Plaintiff did not receive the constitutionally-required DAA treatment because of the cost of the treatment.

110.   The constitutional violations of Defendants GEO, Wellpath, Corizon, and Centurion, through the actions and omissions of its employees and agents, were

directly and proximately caused by policies, practices, and/or customs implemented and enforced by Defendants GEO, Wellpath, Corizon, and Centurion.

111.   As a direct and proximate result of the policies, practices, customs, and deliberate indifference of Defendants GEO, Wellpath, Corizon, and Centurion, Plaintiff has suffered damages, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, the Plaintiff, Charles Cloud, demands judgment against Defendants GEO, Wellpath, Corizon, and Centurion for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

## COUNT III
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA)
### (Against Defendant FDC)

112.   Plaintiff incorporates and re-alleges paragraphs 1 through 87 as if fully set forth herein.

113.   This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101, *et seq.* and 42 U.S.C. §§ 12131–12134, and its implementing regulations.

114. The ADA prohibits public entities from discriminating against individuals with disabilities in their services, programs, and activities. 42 U.S.C. §§ 12131–12134; *see also* 28 C.F.R. §§ 35.130. In other words, the ADA impose an

affirmative duty on public entities to create policies and procedures to prevent discrimination based on disability.

115.   Defendant FDC is a "public entity" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

116.   Plaintiff had chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b). This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

117.   Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

118.   Plaintiff is regarded by FDC as having an impairment that substantially limits one or more major life activity, as FDC perceives them as having such an impairment. 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f).

Defendant FDC has subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

119. Plaintiff was a qualified individual with a disability because he met the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant FDC, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

120. By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC excluded Plaintiff from participation in, and denied him the benefits of, FDC services, programs, and activities (such as medical services) by reason of his disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

121. By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendant FDC subjected Plaintiff to discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

122. DAAs are the only effective medical treatment available for HCV under the prevailing standard of care, and is the constitutionally-required treatment under the Eighth Amendment. Plaintiff requested DAA treatment for his HCV, which was a request for a reasonable accommodation for his HCV. By denying or delaying in providing Plaintiff DAA treatment, Defendant FDC refused or failed to provide

Plaintiff a reasonable accommodation for his request for treatment of his HCV in violation of Title II of the ADA.

123.   Defendant FDC failed to provide Plaintiff with equal access to and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1).

124.   Defendant FDC's refusal to provide Plaintiff with the DAAs also denied Plaintiff access to other prison services, programs, and activities that other inmates routinely access. For example, Plaintiff was unable to participate in recreation and other physical exercise. Further, in the event of a prison fight, because of his physical condition, Plaintiff would be unable to escape quickly. Plaintiff's inability to participate in recreational activities in the prison yard isolates Plaintiff and denies him meaningful access to these prison services, programs, and activities.

125.   Defendant FDC utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination and that defeated or substantially impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

126.   DAAs were readily available to Defendant FDC during this time period and yet it categorically refused to provide Plaintiff with treatment that the medical community deems essential.

127.  Defendant FDC denied and delayed providing Plaintiff with the necessary treatment and reasonable accommodation for his HCV because of the cost of the treatment and accommodation.

128.  Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff. Such violations include but are not limited to (a) FDC's refusal to provide Plaintiff with the only medical treatment available under the prevailing standard care, (b) FDC's refusal to provide Plaintiff with DAA treatment because the cost of such treatment was too expensive, and (c) to the extent it lacked sufficient funds to purchase and treat HCV-infected inmates like Plaintiff with DAAs, FDC's refusal or failure to even request adequate funding from the Florida Legislature.

129.  Had Defendant FDC not delayed but instead provided Plaintiff with DAA treatment and the reasonable accommodation he requested from 2003 through his release in 2019, Plaintiff would not have suffered additional injuries, including both physical injuries and emotional pain and suffering.

130.  Defendant FDC owed Plaintiff a non-delegable duty to ensure that his wellbeing would not be compromised as a result of discrimination based on his disability. As such, Defendant FDC is vicariously liable for the actions of any and all persons or entities Defendant FDC contracted out its medical services to or otherwise designated to care for Plaintiff.

131.   As a direct and proximate cause of Defendant FDC's actions and omissions, Plaintiff has suffered and continues to suffer from harm and violation of his ADA rights.

WHEREFORE, the Plaintiff, Charles Cloud, demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## COUNT IV
## SECTION 504 OF THE REHABILITATION ACT (RA)
### (Against Defendant FDC)

132.   Plaintiff incorporates and re-alleges paragraphs 1 through 87 as if fully set forth herein.

133.   This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, *et seq.* and 29 U.S.C. § 791–794, *et seq.*, and its implementing regulations.

134.   Section 504 of the RA prohibits discrimination against persons with disabilities by any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

135. Defendant FDC is a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794.

136. Defendant FDC excluded Plaintiff—a qualified individual with a disability—from participation in, and denied him the benefits of, programs or activities solely by reason of his disability. 29 U.S.C. § 794(a); 29 U.S.C. § 705(20); 28 C.F.R. § 42.503(a).

137. Defendant FDC subjected Plaintiff—a qualified individual with a disability—to discrimination. 29 U.S.C. § 794(a).

138. Defendant FDC denied Plaintiff—a qualified handicapped person—the opportunity accorded to others to participate in programs and activities. 28 C.F.R. § 42.503(b)(1).

139. Defendant FDC utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of FDC's programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3).

140. Defendant FDC knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff.

141. As a direct and proximate cause of Defendant FDC's exclusion and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his RA rights.

WHEREFORE, the Plaintiff, Charles Cloud, demands judgment against Defendant FDC for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts alleged above.

Respectfully submitted,

The Law Offices of
STEVEN R. ANDREWS, P.A.
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ John M. Vernaglia*
STEVEN R. ANDREWS (FBN: 0263680)
steve@andrewslaw.com
RYAN J. ANDREWS (FBN: 0104703)
ryan@andrewslaw.com
JOHN M. VERNAGLIA (FBN: 1010637)
john@andrewslaw.com
service@andrewslaw.com
*Attorneys for Plaintiff*